

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:23-CR-36 (RDA) |
| CHRISTIAN VANCE KIRSCHNER, | |
| Defendant. | |

### STATEMENT OF FACTS

The United States and the defendant, CHRISTIAN VANCE KIRSCHNER ("KIRSCHNER"), stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and the defendant further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I. Introduction**

1. As set forth in greater detail below, from at least in or around April 2017 and continuing through in or around September 2019, in the Eastern District of Virginia and elsewhere, defendant KIRSCHNER, B.W., C.N., C.H.K., R.A., K.R., and others known and unknown, did knowingly conspire and agree with each other to commit honest services wire fraud, that is: having devised or intending to devise a scheme and artifice to defraud the Victim Company of its right to the honest services of its employees through bribery or kickbacks, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

2.  More specifically, it was the purpose of the conspiracy to engage in a kickback scheme through which B.W. and Company 1 made kickback payments to employees of the Victim Company, namely, C.N. and C.H.K., which payments KIRSCHNER helped to facilitate. These kickback payments were made in exchange for those employees steering real estate development deals in the Eastern District of Virginia from the Victim Company to Company 1.

## II. Factual Background

### A. Relevant Individuals, Entities, and Transactions

3.  Company 1 was a Denver, Colorado-based commercial real estate and development company. B.W. was Company 1's Chief Executive Officer ("CEO").

4.  In or around 2016, KIRSCHNER began serving nominally as a "consultant" for Company 1, making $4,000 per month consistent with KIRSCHNER's agreement with B.W. However, aside from deals with the Victim Company, KIRSCHNER never referred any real estate deals to Company 1.

5.  Since in or around 2018, the Victim Company executed leases with Company 1 for nine data center buildings in Northern Virginia, within the Eastern District of Virginia. The total approved to be spent for these deals was approximately $415.5 million.

6.  In or around November 2017, K.R. began working at Company 1 as a project manager, and he was soon promoted to Director of Development. In that role, K.R. was responsible for managing the Northern Virginia real estate development deals involving the Victim Company and Company 1, on behalf of B.W. K.R. worked with W.C., who was a financial analyst at Company 1, on many of the projects involving the Victim Company.

2

7.     At all times relevant to the conspiracy, C.H.K. was an employee of the Victim Company overseeing real estate development in Northern Virginia, including the nine real estate development projects involving Company 1. KIRSCHNER and C.H.K. are siblings.

8.     Until approximately mid-June 2019, C.N. was a Senior Manager of Real Estate at the Victim Company and was C.H.K.'s supervisor. C.N. was also involved in real estate transactions on behalf of the Victim Company in Northern Virginia.

9.     R.A. is a Colorado-based attorney who owns and operates Law Firm 1. KIRSCHNER first met R.A. in or around 2008.

10.    The Villanova Trust was created on or about December 31, 2017, and maintains a bank account at First Horizon Bank, formerly known as First Tennessee Bank, account ending in 9508. KIRSCHNER was the trustee for the Villanova Trust.

11.    The 2010 Irrevocable Trust was created on or about March 27, 2018, by R.A. and maintains a bank account at First Western Trust Bank, account ending in 3698. R.A. controls the bank account, and KIRSCHNER is listed as the "Trust Protector" for the 2010 Irrevocable Trust.

12.    Allcore Development was also formed on or about March 27, 2018, by R.A. V.L., an associate of R.A., is listed on various documents as both Allcore Development's president and manager.

### III. Criminal Conduct

*Kirschner Introduces C.H.K. and B.W.*

13.    In or around July 2017, KIRSCHNER met with C.H.K. at C.H.K.'s residence in Minnesota. During that meeting, KIRSCHNER asked C.H.K. about the possibility of a relationship between the Victim Company and Company 1.

3

14. KIRSCHNER informed C.H.K. that he (KIRSCHNER) would receive a fee for establishing the relationship between the Victim Company and Company 1. At the conclusion of that meeting, both KIRSCHNER and C.H.K. understood that C.H.K. would receive some portion of the funds that KIRSCHNER was to be paid related to the prospective deals between the Victim Company and Company 1. KIRSCHNER originally understood that his referral fee for establishing the relationship between the Victim Company and Company 1 would be around $100,000 to $200,000.

15. On or about July 19, 2017, in Dulles, Virginia, and elsewhere within the Eastern District of Virginia, KIRSCHNER met with B.W. and C.H.K. KIRSCHNER had previously informed B.W. that his sibling, C.H.K., worked for the Victim Company and had discussed the possibility of deals between the Victim Company and Company 1. C.H.K. gave B.W. a tour of various developments associated with the Victim Company, which were located in the Eastern District of Virginia.

16. On or about July 24, 2017, B.W. emailed KIRSCHNER to inform him that he was meeting with C.H.K. and C.N. in Seattle, Washington, to discuss business deals between Company 1 and the Victim Company.

17. On or about August 24, 2017, B.W. met with the Victim Company, including C.N. and C.H.K., in Seattle, Washington. After that meeting, on or about September 8, 2017, C.H.K. sent a request for proposal to B.W. and Company 1 for a data center development project in Northern Virginia, within the Eastern District of Virginia.

18. KIRSCHNER understood that C.H.K. provided B.W. with sensitive information in order for Company 1's proposal to be attractive to the Victim Company. For instance, following his meeting with C.H.K. in Northern Virginia on July 19, 2017, B.W., from within the Eastern

District of Virginia, emailed KIRSCHNER notes from his tour with C.H.K., which B.W. advised KIRSCHNER to keep confidential. B.W.'s email contained confidential information related to competitors' bids related to past developments with the Victim Company. KIRSCHNER understood that this confidential information had been passed from C.H.K. to B.W.

19. On or about September 21, 2017, Company 1 responded to the RFP from the Victim Company. The Victim Company awarded the project to Company 1 shortly thereafter on or about October 3, 2017.

20. In or around December 2017, KIRSCHNER received a preliminary referral fee structure proposal from B.W., which KIRSCHNER subsequently discussed with C.H.K., who told KIRSCHNER that he should negotiate a higher fee structure. During these discussions, C.H.K. explicitly informed KIRSCHNER that C.H.K. wanted to be involved in the fee structure with Company 1 and receive compensation from Company 1. C.H.K. also requested that C.N. be involved in the referral fee agreement with Company 1. KIRSCHNER and C.H.K. understood, however, that the Victim Company's employees were not authorized to receive referral fees or other compensation associated with the Victim Company's real estate deals.

21. KIRSCHNER and C.H.K. worked to negotiate the fee arrangement with Company 1, with KIRSCHNER serving as the intermediary between C.H.K., C.N., and B.W., in order to disguise C.H.K. and C.N.'s involvement.

22. For example, B.W. told KIRSCHNER that he would agree to the proposed fee structure if C.H.K. could give B.W. an "exclusive" on future development deals with the Victim Company. C.H.K. informed KIRSCHNER that such an exclusive arrangement would not be feasible as it would raise red flags at the Victim Company; however, C.H.K. assured KIRSCHNER

that there would be more opportunities for Company 1 to conduct deals with the Victim Company in the future if B.W. agreed to the referral fee arrangement.

23.     On or about January 8, 2018, B.W. and KIRSCHNER, doing business as the Villanova Trust, signed an Independent Contractor Agreement. For projects involving Company 1 and the Victim Company, the Independent Contractor Agreement specified that Company 1 would pay the Villanova Trust a portion of the profits/fees that Company 1 received associated with its deals with the Victim Company.

24.     Ultimately, due to the efforts of C.N. and C.H.K., Company 1 was selected as a developer for nine deals with the Victim Company in Northern Virginia, the first of which closed on or about February 28, 2018.

*Victim Company Employees Receive Kickbacks from Company 1*

25.     As KIRSCHNER, C.H.K., B.W., and C.N. well knew, C.H.K. and C.N. could not receive compensation from B.W. or Company 1 in exchange for Company 1 receiving deals from the Victim Company.

26.     To conceal the involvement of the Victim Company employees C.H.K. and C.N., and to obscure the ownership and control of the purported referral fees, R.A. established the Villanova Trust for KIRSCHNER, with KIRSCHNER serving as the "trustee" for the - trust. R.A. informed KIRSCHNER that using the trust provided anonymity, protected the funds, and had additional tax benefits.

27.     In total, during the life of the conspiracy, Company 1 paid $5,112,983.84 to the Villanova Trust associated with Victim Company deals, which were remitted on or about the dates referenced below:

6

| Date | Amount |
|---|---|
| 3/8/2018 | $50,000.00 |
| 5/1/2018 | $382,500.00 |
| 5/7/2018 | $281,350.00 |
| 7/30/2018 | $1,447,614.50 |
| 10/2/2018 | $1,297,011.18 |
| 11/7/2018 | $122,319.64 |
| 12/7/2018 | $1,061,160.08 |
| 6/7/2019 | $150,000.00 |
| 8/7/2019 | $321,028.44 |

KIRSCHNER understood that each of these payments was an unlawful "kickback," *i.e.*, that B.W. caused Company 1 to make each of these payments in exchange for C.H.K. and C.N. causing the Victim Company to award real estate deals in Northern Virginia to Company 1.

28.     Consistent with the unlawful agreement, KIRSCHNER personally received $1,737,358.84 of the funds paid to the Villanova Trust, which represented his personal profits from the kickback arrangement for his role as the intermediary between B.W, C.H.K., and C.N.

29.     To permit C.H.K. and C.N. to access the kickback payments that flowed through the Villanova Trust, but to further conceal the true ownership and control of the funds, R.A. created the 2010 Irrevocable Trust with KIRSCHNER as the "Trust Protector." R.A. informed KIRSCHNER that he (KIRSCHNER) could wire funds from the Villanova Trust to the 2010 Irrevocable Trust to conceal the fact that C.H.K. and C.N. were the ultimate recipients of the kickback payments from B.W. and Company 1.

30.     KIRSCHNER was responsible for sending kickback payments from the Villanova Trust to the 2010 Irrevocable Trust. KIRSCHNER understood that payments sent to the 2010 Irrevocable Trust would ultimately be accessed by C.H.K. and C.N. and used for their own personal benefit.

31.     From on or about August 7, 2018, through on or about August 9, 2019, KIRSCHNER initiated the following transfers of funds totaling $3,375,625.00 from the Villanova Trust to the 2010 Irrevocable Trust:

| Date | Amount |
|---|---|
| 8/7/2018 | $1,408,000.00 |
| 10/5/2018 | $864,666.00 |
| 11/8/2018 | $81,550.00 |
| 12/7/2018 | $707,409.00 |
| 6/12/2018 | $100,000.00 |
| 8/9/2019 | $214,000.00 |

32.     KIRSCHNER made the aforementioned transfers at the direction of R.A. and C.H.K. for the purpose of providing C.H.K. and C.N. with access to the kickback payments they had obtained through the guise of the referral agreement between Company 1 and the Villanova Trust.

33.     After KIRSCHNER wired funds to the 2010 Irrevocable Trust, C.H.K. and/or C.N. directed R.A. to disburse funds to them or to other entities or accounts for their (C.H.K.'s and/or C.N.'s) benefit.

34.     R.A. established other shell entities on behalf of himself, C.H.K., and C.N. One such shell entity was Allcore Development. R.A. informed KIRSCHNER that an individual named V.L. would serve as a "straw man" in the kickback arrangement with C.H.K. and C.N. to further conceal C.H.K.'s and C.N.'s involvement in the corrupt bargain. V.L. was inserted as the "president" and "manager" of Allcore Development on documents related to this entity. V.L.'s actual role with Allcore Development was to sign documents, collect mail, and follow R.A.'s instructions regarding the entity.

35. In truth and in fact, V.L. was not the actual owner or manager of Allcore Development. R.A., C.H.K., C.N., and KIRSCHNER knew that Allcore Development was effectively controlled by C.H.K., C.N., and R.A., and that V.L.'s name had been listed on documents related to Allcore Development as a means to conceal the true identity of the persons controlling this entity and to conceal the corrupt bargain.

36. In addition to efforts to conceal the financial benefit the co-conspirators received from the kickback scheme, C.H.K., C.N., KIRSCHNER, and others also attempted to conceal their communications by using encrypted messaging applications such as WhatsApp to discuss the unlawful agreement. For example:

   a. On or about August 2, 2018, C.H.K. sent a WhatsApp text message to KIRSCHNER: "Hi Brother! Can you work with [R.A.] to have our shares wired to his Trust? I just talked to him he will disperse [sic] from there. Thanks!! Also, looks like we're gonna get another 1.2 [million dollars] in Sept and 1.4 [million dollars] in Oct."

   b. On or about August 6, 2018, KIRSCHNER sent a WhatsApp text message to C.H.K.: "Just left bank. Wiring going out today. Will send an email when complete and I will let you know."

   c. On or about August 6, 2018, KIRSCHNER sent additional WhatsApp text messages, including: "Just spoke to [R.A.]. He has the money. $1,408,000."

   d. On or about October 10, 2018, C.H.K. sent a WhatsApp text message to KIRSCHNER: "Hey brother. Wire hit today. Please send what was wired and work with [R.A.] to get our share wired to his trust ASAP. Thanks!!"

   e. KIRSCHNER responded to this October 10 message with the following: "$1.297M / $432,333 a piece / $864,666 will transfer ASAP."

37. KIRSCHNER was initially contacted by law enforcement on April 2, 2020. After that contact, KIRSCHNER spoke with R.A. about the kickback arrangement. R.A. claimed that that C.N. and C.H.K. were not paid by B.W. or Company 1 from these deals. However, as KIRSCHNER, R.A., and the other co-conspirators knew, the kickback payments were previously described as "loans" to give the perception that no actual payments were made and that their actions were lawful when, as the co-conspirators knew, they were not. No loan documentation accompanied the purported "loans," and KIRSCHNER and his co-conspirators understood that C.N. and C.H.K. were not expected to repay any of the money that they received from B.W. and Company 1 (through the Villanova Trust, the 2010 Irrevocable Trust, Allcore Development, and other shell entities).

## IV. Conclusion

38. KIRSCHNER's actions in furtherance of the charged offense, including but not limited to the acts described above, were done willfully and knowingly, and not because of accident, mistake, or other innocent reason.

39. The foregoing Statement of Facts is a summary of the principal facts that constitute the legal elements of conspiracy to commit honest services wire fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine KIRSCHNER's sentence under the Sentencing Guidelines after a trial.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: *[signature]*
Heidi B. Gesch
Russell L. Carlberg
Assistant United States Attorneys

<u>Defendant's Stipulation and Signature</u>: After consulting with my attorneys and reviewing the above Statement of Facts, I stipulate that the above Statement of Facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proven the same, as well as the allegations in the one-count criminal Information, beyond a reasonable doubt.

_____
Christian Vance Kirschner
Defendant

<u>Defense Counsel Signatures</u>: I am the defendant, Christian Vance Kirschner's, attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Chris Flood
Counsel for the Defendant